UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN SECTION

CIVIL ACTION NO.

04-30068-MAP

VIDEO COMMUNICATIONS, INC.,

    Plaintiff

v.

MATTHEW R. FLECK,

    Defendant

## COMPLAINT FOR DECLARATORY AND FURTHER RELIEF

Plaintiff, Video Communications, Inc. ("VCI") brings this action for declaratory judgment and further relief against Defendant Matthew R. Fleck ("Fleck") because an actual controversy exists between the parties concerning the enforceability of an employment agreement including specifically, a non-competition agreement, to which VCI and Fleck are parties (the "Employment Agreement"). Accordingly, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, VCI seeks an expedited declaration and judgment from the Court declaring the rights, status and legal relationship of the parties under the Employment Agreement and an Order enjoining Fleck from competing with VCI in violation of the Employment Agreement.

### The Parties and Jurisdiction

1. VCI is a Massachusetts Corporation with a principal place of business at 146 Chestnut Street, Springfield, Massachusetts.

2. Fleck is a natural person of legal age with a residential address of 42851 Camino Alagon, Temecula, California.

3. The Court has jurisdiction and venue over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the value of the rights of the parties in dispute exceeds $75,000.00 exclusive of interest and costs.

### Factual Background

4. VCI creates computer software that it licenses to television stations, radio stations and cable channels. Specifically, the VCI software manages the "back of the house" operations of broadcasting operations by providing the ability to sell, contract, schedule and invoice for advertising airtime. The VCI software is an extremely complex and advanced package of programs that takes weeks to install at any one location. It has been developed and enhanced over a period of more than twenty years at the cost of tens of millions of dollars. Presently, VCI's sole product is a version of its traffic software known as Stars II Plus.

5. VCI offers its software for license in a substantial part of world and seeks to expand the market for its software. Its customers currently use its software in the United States and Canada.

6. The traffic software business is highly competitive.

7. The Stars II Plus software and underlying code are highly confidential trade secrets.

8. VCI carefully guards its confidential information and trade secrets.

9. The disclosure of certain VCI confidential information and/or trade secrets to VCI's competitors would be devastating to its business and would cause VCI substantial and irreparable harm.

10. In or about November, 1995, VCI retained Fleck, who was highly experienced as a freelance consultant for implementing software applications using a product known as POWERBUILDER, as a consultant to design, write and test what became the STARS II Plus product using the POWERBUILDER tools. When he was retained, Fleck had no prior experience in writing software applications for broadcasting operations. Fleck's expertise was POWERBUILDER, not broadcasting.

11. When he was retained, VCI and Fleck executed a consulting agreement containing non-competition provisions and provisions designed to protect VCI confidential information and materials created by Fleck and others for VCI.

12. Fleck worked for VCI as a software consultant from about November 1995 until he became an employee of VCI in or about April 1997.

13. On or about April 16, 1997, Fleck was hired by VCI as a Product Development Manager. His duties and responsibilities included designing, writing and testing new software for VCI to be used by VCI's television station and cable channel customers.

14. When he was hired as an employee, Fleck and VCI executed an Employment Agreement. A true copy of the Employment Agreement is attached hereto and incorporated herein as Exhibit A.

15. Fleck and VCI executed the Employment Agreement at VCI's offices in Springfield, Massachusetts.

16. The Employment Agreement sets forth Fleck's obligations with regard to protection and non-disclosure of VCI's confidential information being all information VCI treats as confidential regardless of whether it is a trade secret ("Confidential Information").

3.1. Enjoining Fleck from competing with VCI anyway in the world until the latter of: (a) March 5, 2005 or if Fleck is found to have competed or is competing with VCI, (b) for one year from the time when he has permanently stopped competing. For the purpose of the Court's Order "Competing" with VCI should be defined as: (a) to deal in any way (for example, to develop or sell, whether or not for profit) in any products or services that compete with traffic systems or any of the other products or services that VCI offers at that time, or to have any relationship or connection with any other person or entity that does, so excluding companies not involved in marketing, developing, or selling products or services competitive with those offered by the VCI, or, (b) hiring or attempt to hire (for the purpose of working on a traffic system or any other product or service which competes with those offered by VCI at that time), whether as an employee, consultant or otherwise, any person who was working for VCI on of March 5, 2004 or during the three years prior thereto;

3.2. Enjoining Fleck from disclosing, to any person other than VCI or its authorized agents, any of VCI's Confidential Information until after March 5, 2009; and

3.3. Ordering Fleck to return to VCI any and all of VCI's Confidential Information in his possession, custody or control or destroy any and all of VCI's Confidential Information in his possession, custody or control and certify its destruction.

4. That this Court enter all such other and further relief, including money damages, as the Court deems just and appropriate and as equity may require.

## REQUEST FOR EXPEDITED RELIEF

Pursuant to Fed. R. Civ. P. 57 and § 28 U.S.C. §2201, VCI requests that this Court, after an expedited hearing, declare the rights, duties, and legal obligations and relationship of the



**IDEO COMMUNICATIONS, INC.**
*Broadcast Business Solutions*

As Of April 1, 1997

Mr. Matthew Fleck
244 Rancho Camino
Fallbrook, CA 92028

Dear Matthew:

The purpose of this letter is to state the agreement between you and Video Communications, Inc. (the Company) about your employment with the Company.

The Company will employ you in the position of Product Development Manager and you will report to the Head of Research and Development. Your duties will be those assigned to you and will include the design, writing and testing of new software to be used by television stations and cable channels. Initially, this work will be specifically in the area of converting VCI's current database applications to operate with Powersoft tools in a WINDOWS® Software environment.

For the first year of your employment or longer if included thereon, your compensation and benefits will be as set forth in Schedule A to this letter. After Schedule A ceases to apply, your compensation and benefits will be governed by standard Company operating policies as they exist from time to time.

In order to protect the Company, you have assured us that:

- you have described your background truly and completely;

- your employment with the Company will not violate any obligation you may have; and

- you will not bring to the Company or use in your work any confidential material, documents or other property of any former employer or other person.

During your employment with the Company you may be exposed to Confidential Information of the Company or others dealing with the Company. The term "Confidential Information" means all information, whether of the Company or of any others dealing with the Company, that the Company treats as confidential during the time of your employment, even if that information is not a "trade secret" as defined by law. You agree that:

- you will not disclose any Confidential Information to any person except other employees or agents of the Company who need to know the Confidential Information in order to do their jobs for the Company;

- you will not use the Confidential Information for any purpose other than to do your own job for the Company; and

Matthew Fleck
As Of April 1, 1997
Page 2

- you will safeguard the confidentiality of the Confidential Information by taking all precautions that the Company requires and that you would take to safeguard your own most confidential information. This agreement will not apply to information:

  - that you knew before your employment with the Company;

  - that is already available to the public;

  - that becomes available to the public other than by unauthorized disclosure; or

  - that you develop without any use of any of the Confidential Information.

During your employment you may also create certain materials for the Company. The term "Created Materials" means anything that you create or do for the Company by yourself or the others. Created Materials may be tangible things like documents, drawings, prototypes, reports, schematics, software, specifications, etc., or may be intangible things like concepts, discoveries, ideas, information, etc. Something is a Created Material if you created or did it during the time in which you are employed by the Company, even if you created or did it only in part, or only together with other people, or out of normal business hours, so long as it is applicable to the Company's business. With respect to Created Materials, you agree that:

- they will be the sole and exclusive property of the Company, and you assign to the Company all of your rights in Created Materials;

- you will keep complete appropriate documentation of the conception, development and reduction to practice of Created Materials;

- you will disclose all Created Materials, including your documentation, to the Company promptly and completely;

- to the extent a copyright may be obtained in any Created Material, that Created Material will be considered a work made for hire under the copyright laws of the United States;

- you will sign any documents and assist the Company in any applications or proceedings that may be necessary to secure for the Company the ownership or protection of the Created Materials and any patents, copyrights or other proprietary rights related to the Created Materials. If necessary for the Company, you will do these things even after your employment with the Company is over, in which case the Company will pay you a reasonable fee for the time that you spend on its behalf and reimburse you for any ordinary and necessary out of pocket expenses that you incur; and

- you will deliver to the Company all Created Materials when your employment with the Company is over.

Either you or the Company may terminate your employment with the Company at any time and for any reason. Your obligations to the Company with respect to Confidential Information and Created Materials, however, will continue for five years after your employment with the Company is over.

Matthew Fleck
As Of April 1, 1997
Page 3

For one year after your employment with the Company is over (no matter how your employment ended) you will not compete with the Company anywhere in the world. "Competing" with the Company means to deal in any way (for example, to develop or sell, whether or not for profit) in any products or services that compete with traffic systems or any of the other products or services that the Company offers at that time, or to have any relationship or connection with any other person or entity that does so but excludes companies not involved in marketing, developing, or selling products or services competitive with those offered by the Company. "Competing" also means to hire or attempt to hire, whether as an employee, consultant or otherwise, any person who was working for the Company at the time you left for any purpose and to hire or attempt to hire, whether as an employee, consultant or otherwise, any person who worked for the Company during the three years before the end of your employment for the purpose of working on a traffic system or any other product or service which competes with those offered by the Company at that time. If a Court should later decide that this agreement not to compete is unreasonable in the length of time or geographic area that it covers, then you agree that the Court will enforce this agreement for the time and in the area that it considers reasonable. You also agree that if you violate this agreement not to compete with the Company, then the agreement will last for one year from the time when you have permanently stopped violating it.

If this letter accurately states our agreement about your employment, please sign the enclosed copy of the letter and return it to me. Both you and the Company will then have set their hands and seals upon this Letter Agreement, which will then be effective as of April 1, 1997 and will be the complete agreement between you and the Company with respect to your employment, will supersede our previous discussions and communications and will be governed by the laws of Massachusetts. The fact that the language of this letter or appendix has been supplied by the Company will not affect its interpretation or enforceability.

Sincerely yours,
VIDEO COMMUNICATIONS, INC.

By: _____
Claude Morris
Vice President & Chief Operating Officer

AGREED AND ACCEPTED:

_____
Matthew Fleck

Date: 4/16/97

Matthew Fleck
As Of April 1, 1997
Page 4

## SCHEDULE A

**SALARY**

Starting Base salary of $120,000 per year for the first year of your employment.

**INCENTIVE STOCK OPTION PLAN**

Your position will be eligible for consideration of an award under the Company's Incentive Stock Option Plan. You must be an employee for one year prior to consideration for an option.

**SPECIAL STOCK BONUSES**

Yearly stock bonuses will be awarded to you based on the following criteria:

1. Upon completion of the first year of your employment on April 1, 1998, you will be entitled to receive a stock bonus of:

    1.1   1,200 shares of Company common stock at a value of $10.00 per share if the Company's Stars II+ software has been successfully and timely released. "Successful" means that as of April 1, 1998 no one who signed an agreement to license Stars II+ software has (1) canceled their contract with VCI (2) refused to accept installation or (3) requested that the STARS II+ software be removed for reasons relating to the quality, operation or support of the Stars II+ software product. Cancellation, refusal to accept installation or a request that the STARS II+ software be removed for reasons other than the quality, operation or support of the Stars II+ software product is excepted from this provision. "Timely" means the Stars II+ software has been released to beta testing at sites since May 1, 1997 and is certified by the Chief Operating Officer for full release to Company customers by June 30, 1997.

    1.2   800 shares of Company common stock at a value of $10.00 per share if the Company's Stars II+ multi market software option has been successfully and timely released. "Successful" means that as of April 1, 1998 no one who signed an agreement to license Stars II+ software with the multi-market option has (1) canceled their contract with VCI or canceled that part of the contract relating to the multi-market option (2) refused to accept installation of either the STARS II+ product or the multi-market option or (3) requested that the STARS II+ software or the multi-market option be removed for reasons relating to the quality, operation or support of the Stars II+ software product or the multi-market option. Cancellation, refusal to accept installation or a request that the STARS II+ software or the multi-market option be removed for reasons other than the quality, operation or support of the Stars II+ software product or the multi-market option is excepted from this provision. "Timely" means the Stars II+ software multi-market option has been released to beta testing at sites since August 1, 1997 and is certified by the Chief Operating Officer for full release to Company customers by November 30, 1997.

    If there are changes to the specifications of the Stars II+ product or the multi-market option which the Company agrees in writing shall cause the implementation of the Stars II+ product or the multi-market option to be delayed, then the dates set forth in paragraphs 1.1 and 1.2 above will be extended by number of days agreed to by the Company in consultation with you.

Matthew Fleck
As Of April 1, 1997
Page 5

2. The Company agrees that you will have a Special Stock Bonus for each of the years ending April 1, 1999 and April 1, 2000. The terms of your Special Stock Bonus, including deliverables and measurements, will be determined at least two weeks prior to each anniversary date and will be subject to the approval of the Chief Operating Officer. It is agreed, however, that assuming you meet the requirements for all of the Special Stock Bonuses, at April 1, 2000, the total number of shares of common stock you will receive from the cumulative total of all of the Special Stock Bonuses will be equal to Four Thousand Eight Hundred Eighty Nine (4,889.00) Shares. This Four Thousand Eight Hundred Eighty Nine (4,889.00) Shares does not include any shares which you purchase or obtain through other agreements or the Incentive Stock Option Plan.

You specifically understand and agree that the Company's Incentive Stock Option Committee shall set the fair market value for all shares subject to the Special Stock Bonus for each of 1999 and 2000 and that the Incentive Stock Option Committee shall use the same process for the determination of fair market value under this Agreement as it does under the Incentive Stock Option Plan. All restrictions on common stock applicable to all other holders of the Company's common stock shall apply to the shares issued to you. You must be an employee in good standing at the end of each bonus period for the bonus earnings to be earned and payable. If you are not an employee in good standing on said date, then said bonus earnings will become payable when you return to good standing, if you return to good standing. "Good standing" means that you are not working under a notice of termination, resignation or on any suspension, warning or disciplinary period for violation of policy or poor performance. It is also understood that if you are not in the Company's active employment on the date any bonus measurement period ends, then you shall not be entitled to any such bonus. If you die at any time after you have earned any Special Stock Bonus but before said stock is issued to you, it shall be issued in the name of your estate.

3. Without in any way derogating from the at-will nature of the relationship between you and the Company, the Company agrees that is shall not have the right to terminate your employment for purpose of defeating the collectibility of any previously earned Special Stock Bonus. If there is a dispute between you and the Company over whether you are entitled to collect a Special Stock Bonus after termination of your employment, it is hereby agreed that the matter shall be submitted to arbitration before a member of the Labor Arbitration Panel of the American Arbitration Association's Boston Office pursuant to the then current Labor Arbitration Rules of the American Arbitration Association with the limitation that the arbitrator is empowered only to decide any question related to whether the Special Stock Bonus is to be paid or not but is not empowered to make any other or further award except that the parties agree that the costs of the arbitration (but not attorney fees) shall be paid by the losing party to the arbitrator. In the event that the winning party has already paid all or part of the cost of arbitration, the losing party shall reimburse those payments.

4. This stock bonus does not preclude any other mutually agreed upon bonuses or commissions.

**BONUS PLAN**

Since you will not be a full time employee for the entire calendar year 1997, you will not be eligible for the 1997 bonus plan.

**OTHER TERMS & CONDITIONS**

On April 1, 1997, the effective date of this agreement, you will convert Ten Thousand Dollars ($10,000.00) of your account receivable from the Company into shares of the Company's common

Matthew Fleck
As Of April 1, 1997
Page 6

stock at a value of Ten Dollars ($10.00) per share). This conversion will be applied first to the youngest outstanding invoices.

You will not be required to relocate and will continue to live where you choose, however, you are required to devote that amount of time away from home which is reasonably required or requested by the Company or its clients to effectively and efficiently perform the work which is required of this position. Your costs of travelling to and from Massachusetts and your reasonable living expenses will be continued to be paid by the Company as travel expenses. The Company will not guaranty you that these expenses are not income to you or protect you from any income taxes which may be required to be paid as a result of the reimbursement of these expenses.

You may continue to support your other current clients but will not take on any additional clients. The list of your current clients is Peter Storer & Associates, for which you work approximately one day per month and other past clients that call you with questions, on which you collectively spend an average of two hours per month. If there is a conflict between the Company's needs and your other clients', you agree that the Company will be your first priority its work will be addressed and resolved first.

When the Company needs any of the following items, it will purchase them first from you at a price not to exceed that which the Company can purchase the same products for elsewhere:

    One (1) copy PowerBuilder Enterprise
    One (1) copy Sybase SQL Server
    One (1) Pentium notebook (used)

```
Printed By: Marwan Zubi                        Page: 1                      4/2/04 3:57:27 PM
```

**Subject:** RE: Separation Agreement
**Date:** Thursday, April 1, 2004 1:16:55 PM
**Sender:** Matthew Fleck <mattf@sds.com>
**To:** Lowell Putnam <LowellP@Vcisolutions.com>
**Cc:** Fode@brownlawsd.com , Marwan Zubi <marwan.zubi@niclawgrp.com> , Randall Garner <RandallG@Vcisolutions.com>

Lowell,

Thank you for the reply. I also understand and regret the necessity of including the lawyers (nothing personal folks).

As far as the customer databases and source codes goes, I have already deleted all of that stuff, which I could find, off of all of my machines. There very well may be a stray library here or there somewhere that I did not find but seeing as I fully expect to be sending you all of these computers I have not been too concerned with it. I plan to format the drives completely to ensure there is no personal data left on them at that should take care of your stuff just as thoroughly. Also, I could not see anywhere in any agreement I signed that I promised to provide a documentation of destruction. However, that is a petty point and I don't plan on being petty. Individual CDs that I have had over the years, such as NAB builds have been thrown out when they stopped being useful. For the last two years or so I have obtained almost everything I needed via FTP so hard copies of your data have always been few.

Regarding what equipment I have of yours, I know what I have and have been using but considering the tone of voice of the offer, and what I have had to put up with for the last several months, I don't know what VCI is going to claim that I have. My main concern is that you do not try to claim things that you never bought. My monitor and printer are two examples of what is mine. Individual PC components that were purchased to upgrade my equipment were obsoleted and thrown away several months ago when my new server was delivered. This was done with Mary's blessing at the time. If you are going to argue over those pieces then I guess we will be getting petty. What is the current value of a used Pentium II motherboard these days? Who knows or cares? I could not even donate the stuff to a local school because it was so old.

Onto the offer you made me, you obviously have not looked at it from my perspective. I would much rather do without any further income from VCI than agree to the terms you sent me. I have two major and marketable skills at the moment. One is PowerBuilder and the other is my experience in the broadcast industry. I can tell you that there is much more interest in the latter than in the former. Considering that I have a family to support it would be irresponsible of me to surrender that option for what you have offered. As you should be aware, California is a right to work state. If working for a competitor of yours is the only way I can support my family than you will not be able to stop me. Regardless, that is not a challenge, simply a statement of fact. The truth is that I would prefer to get out of this industry all together but I need capital to do so. Your offer does not satisfy that need.

What I see from your offer is that you want two things from me aside from my giving up the right to sue you. You want me to transfer some knowledge and you want me to not work for any of your competitors. Let's not dress up those items as some sort of generosity on your part. We are both well aware that the potential costs to VCI are huge if you do not get these things from me. Just not being able to get the MCP installed and running properly at CHUM could easily be the deciding factor in loosing them as a client. Were that to happen, it would probably kill VCI's chances at ever moving up market or getting any large groups. Additionally, if I were to show up on sales calls supporting the technical advantages of your competitors, then

EXHIBIT B

that would be hard for you to counter. I am sure you learned this lesson from what happened after you let Martha go.

I am willing to do these things for you if the price is right. However, as yet you have not shown any willingness to negotiate that price. If you want to negotiate, you have my counter offer and we can start from there. If you are going to continue (in my opinion) playing hardball, then we are done. Either way, I am making irreversible decisions today. So if we are going to talk, we had better talk fast.

I am sorry that it has to be this way but after over eight years of loyalty and dedication to VCI I find myself in a position that I never wanted to be in. That company exists today in no small part thanks to my efforts and skill and you could not even get my length of service right.

Matt